IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 26-cv-00218-NRN

SOUTH ADAMS COUNTY WATER AND SANITATION DISTRICT,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER,

    Defendant.

---

**ORDER DENYING DENVER'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6), OR, IN THE ALTERNATIVE, TO STAY (ECF No. 13)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This case involves a cost-recovery action brought by Plaintiff South Adams County Water and Sanitation District (the "District") against Defendant City and County of Denver ("Denver") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.[1]

On March 2, 2026, Denver moved to dismiss the Complaint, ECF No. 1, or, in the alternative, to stay or administratively close this matter. *See* ECF No. 13. The District filed a response, ECF No. 15. Denver filed a reply, ECF No. 19. The Court heard oral argument on April 17, 2026. ECF No. 24. The Court has taken judicial notice of the case file and considered the applicable federal and state statutes and case law. As set forth

---

[1] The parties consented to this Court's jurisdiction on March 24, 2026. *See* ECF No. 16.

below, the Court **ORDERS** that Denver's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or, in the Alternative, to Stay (the "Motion"), ECF No. 13, is **DENIED.**

## I.    BACKGROUND[2]

The District is a special district established and governed under provisions of the State of Colorado Special District Act, Colo. Rev. Stat. §§ 32-1-101 to 1807, and organized to provide water and sanitation district services to the Commerce City area and nearby areas of Adams County. ECF No. 1 at 2. In 2025, the District delivered "over 3,000,000,000 gallons of drinking water to approximately 75,000 people through over 24,000 connections." *Id.* at 4.

To meet its customers' water needs, the District withdraws water from its groundwater wells. *Id.* at 5. The District owns and operates a drinking water supply system that withdraws groundwater from three wellfields overlying an alluvial aquifer tributary to the South Platte River. *Id.* The drinking water wells are located south of East 96th Avenue and north of East 60th Avenue in Commerce City. *Id.* The drinking water supply system includes eight deep groundwater wells. The District also purchases treated water from Denver Water pursuant to a 1998 lease agreement. *Id.* The District also owns and operates a drinking water treatment plant close to the wells that historically has provided drinking water treatment services to its customers (the "Klein Treatment Plant"). *Id.* The plant was not designed or intended to treat "forever chemicals" known as per- and polyfluoroalkyl substances ("PFAS"). *Id.* at 6.

---

[2] Unless otherwise stated, all factual allegations are taken from the Complaint, ECF No. 1. Any citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

The District alleges that Denver has contaminated its water supplies through the ongoing release of certain PFAS, including perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"). *Id.* at 1. PFAS are synthetic chemicals that do not occur naturally and exist in the environment indefinitely. *Id.* at 3. These chemicals may present significant risk to human health and the environment even at low concentrations. *Id.* In May 2024, the Environmental Protection Agency ("EPA") designated PFOA and PFOS as 'hazardous substances.' The rule became effective July 8, 2024. *See* 89 Fed. Reg. 39,124 (May 4, 2024).

The District discovered that its drinking water was contaminated in 2018, when it tested for PFAS, including PFOA and PFOS, in samples drawn from its water wells. ECF No. 1 at 3. The District alleges that the PFAS levels detected in the raw water samples ranged from 24 to 2,280 parts per trillion ("ppt"). *Id.* The District alleges that, as of the date of filing this lawsuit, "[p]ursuant to the ongoing monitoring . . . testing conducted by the District confirms that PFAS chemicals are still present at high concentrations in its raw drinking water supplies. For example, in early November 2025, PFOA and PFOS concentrations in certain wells in the District's Central Wellfield were measured as high as 342.6 ppt PFOA and PFOS, combined." *Id.*

The District attributes the release of PFAS to a Fire Training Facility operated by the Denver Fire Department. *See id.* at 7. The facility is owned by and located in Denver, approximately 1 mile south of the District's southern wellfield. *Id.* The District alleges that for decades, Denver used Aqueous Film-Forming Foam ("AFFF") products containing PFAS in connection with training activities at the training facility. *Id.* Specifically, the District alleges that, "on information and belief, Denver would ignite a

3

building located at the Fire Training Facility training pad known as the 'Burn House' and direct firefighting trainees to extinguish the fire using these PFAS-containing firefighting foams." *Id.* The Complaint alleges that Denver's failure to control the foam once deployed has resulted in extensive and ongoing release of PFAS into the environment. *Id.* The Fire Training Facility is "hydraulically upgradient" of the District's drinking water wells. *Id.* The District explains that "[g]roundwater beneath the Fire Training Facility and the PFAS, including PFOA and PFOS, migrates [sic] in the subsurface downgradient" to the District's wells. *Id.*

The District states that the contamination from the Fire Training Facility has caused it to "necessarily incur tens of millions of dollars in costs responding to Denver's contamination of its raw drinking water supplies." *Id.* at 8. Specifically, when it first discovered the contamination in 2018, the District instituted a program at the Klein Treatment Plant to treat the groundwater using granular activated carbon ("GAC") to remove PFAS and ensure that the water quality met regulatory standards and guidelines. *Id.* at 9. The District alleges that it "has incurred, and will continue to incur, response costs associated with this intensive treatment program." *Id.* The District alleges that it has had to increase the amount of treated water it purchases from Denver Water to mix in with and further dilute and reduce PFAS concentrations in the water supply. *Id.* Additionally, the District had to develop "a rigorous and extensive water quality monitoring and testing program to ensure that PFAS concentrations in its blended finished water supplies are at acceptable levels. Relatedly, given the imperative for timely testing results and to reduce costs, the District had to procure in-house laboratory analytical capabilities." *Id.* Per the Complaint, The District has also incurred,

and continues to incur, response costs associated with installing, operating, and staffing its in-house laboratory's PFAS analytical capabilities. *Id.* The Complaint also notes significant costs for consulting and legal services incurred in connection with the District's response to the water contamination. *Id.* Additionally, the District states that it is currently constructing a new dedicated PFAS treatment facility that will use ion exchange technology to treat PFAS in its drinking water. *Id.* at 10. It states that construction of the facility is necessary in order to continue providing drinking water that meets federal and state water quality standards and guidelines. The District states that it has, and will continue to incur, significant necessary costs in connection with the with the construction of this new treatment facility. *Id.*

Based on the above, the District brings claims against Denver for (1) cost recovery under CERCLA § 107(a) to recoup response costs, and (2) declaratory judgment under CERCLA § 113(g) "that Denver is responsible and liable for the District's future response costs . . . ." *Id.* at 14.

### a. Denver's Arguments for Dismissal

Denver moves for dismissal under Rule 12(b)(6), arguing that the Complaint seeks double recovery for costs incurred to address the contamination. Denver notes that in a separate and pending multidistrict litigation, the District has already settled with several manufacturers of AFFF products containing PFAS for the same costs that it now seeks to recover from Denver. ECF No. 13 at 2 (citing *In re: Aqueous Film-Forming Foam (AFFF) Products Liability Litigation (MDL 2873)*, Case No. 2:18-MN-2873-RMG (D.S.C.) (the "MDL")). Denver further argues that the District has also been awarded over $64 million in federal and state grants for the design and construction of

improvements to its water treatment plant to address PFAS contamination. ECF No. 13 at 2–3. Denver argues that CERCLA "expressly precludes a party who has received compensation for remediation costs or damages pursuant to any other federal or state law from receiving compensation for the same costs or damages under CERCLA," and thus the District's cost recovery claim must be dismissed for failure to state a claim. *Id.*

Next, Denver argues that the District's cost-recovery claim fails to state a claim because it "seeks to recover costs that were not incurred to cleanup a hazardous waste site." ECF No. 13 at 10. Denver contends that "[t]he Complaint merely alleges that the District has taken certain actions to improve its water treatment facilities and services" but "includes no allegations that the District incurred any costs to actually remove or cleanup PFAS contamination within the environment, such as through soil removal or other methods consistent with the NCP [National Contingency Plan]." *Id.* at 11.

Lastly, Denver argues that under CERCLA, the scope of recoverable response costs is limited to the cleanup or removal of designated "hazardous substances." PFAS were not designated as "hazardous substances" by CERCLA until the EPA designated them so in May 2024. *See* 89 Fed. Reg. 39,124 (May 4, 2024). The rule became effective July 8, 2024. Denver therefore argues that any costs incurred to address PFAS prior to 2024 are not recoverable under CERCLA.

### b.  Arguments for Stay or Administrative Closure

Denver argues, in the alternative, that the case should be stayed or administratively closed pending the resolution of two related proceedings that may, per Denver, affect or moot the claims in this case:

- First, in *U.S. Chamber of Commerce v. EPA*, Case No. 24-1193 (D.C. Cir.), the U.S. Court of Appeals for the D.C. Circuit is considering whether the EPA's designation of PFOA and PFOS as hazardous substances was unlawful and should be vacated. Oral argument was held on January 20, 2026. Denver argues that if the EPA's designation is vacated, no PFAS would be a CERCLA "hazardous substance," and the District's claims will be moot.

- Second, the MDL remains pending in the District of South Carolina. That matter is currently overseeing the allocation of settlement funds to class members. Denver states that "[t]o date, class members, including the District, have settled with several PFAS manufacturers for over $12.7 billion dollars. The final allocation amount to the District in the MDL must be adjudicated before this Court can determine whether the District has a viable cost recovery claim without violating CERCLA's prohibition against double recovery." ECF No. 13 at 4.

The Court considers these arguments in turn in the following sections.

## II.    MOTION TO DISMISS

### a.  Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). "A court

7

reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679–81. Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

### b. Analysis

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 358–59 (1986)). In enacting CERCLA, Congress sough "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [a]re borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks and citation omitted). "The statute imposes strict liability for environmental remediation, assigning responsibility for cleaning up even

8

pollutants disposed of according to then-acceptable practices before they were known to be hazardous. *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 227 (D.C. Cir. 2016). "[B]ecause CERCLA is remedial legislation, it should be construed liberally to carry out its purpose." *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996).

CERCLA § 107 creates a cause of action through which entities that have incurred costs cleaning up contaminated sites may sue to recover cleanup costs from parties that may have played a role in causing the pollution, whom CERCLA refers to as potentially responsible parties (PRPs). *See Young v. United States*, 394 F.3d 858, 860 (10th Cir. 2005).

### i. The District adequately pleads necessary response costs.

To establish a prima facie case under CERCLA § 107(a), a plaintiff must show "(1) the site is a facility, (2) defendant is a responsible person, (3) the release or threatened release of a hazardous substance has occurred, and (4) the release or threatened release caused the plaintiff to incur necessary response costs consistent with the National Contingency Plan ('NCP')," *Young*, 394 F.3d at 862 (citing *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 845 (10th Cir. 1993)).

Denver's Motion does not contest the first three elements. Instead, Denver challenges the fourth element. Denver argues that the District's cost-recovery claim fails because it "seeks to recover costs that were not incurred to cleanup a hazardous waste site." ECF No. 13 at 10. It argues that "[t]he Complaint includes no allegations that the District incurred any costs to actually remove or cleanup PFAS contamination within the environment, such as through soil removal or other methods consistent with the NCP." *Id.* at 11. However, the Complaint contains numerous detailed allegations regarding the

9

District's response efforts and associated costs. *See* ECF No. 1 ¶¶ 32–40. The District alleges it had to "procure in-house laboratory analytical capabilities" to test and monitor water quality. *Id.* Monitoring costs are recoverable under CERCLA. *See Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 930–31, 934 (6th Cir. 2004) (holding city could recover monitoring and investigation costs for offsite contamination that migrated to its wells and contaminated its water supplies); 42 U.S.C. § 9601(23) ("the terms 'remove' or 'removal' means . . . such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ."). The District also increased the amount of blending water it procured from Denver Water. ECF No. 1 ¶ 34. Such costs are also consistent with the NCP. *See* NCP, 40 C.F.R. § 300.415(e)(9) (listing "provision of alternative water supply" as an appropriate removal action under NCP pending a permanent remedy); *Santa Clarita Valley Water Agency,* 99 F.4th at 479 (holding that purchases of blending water to protect customers from contamination were recoverable). The Complaint alleges that the District instituted a new program at its Klein Treatment Plant to treat groundwater using GAC to remove PFAS. *Id*. Further, the District has undertaken construction of a new PFAS treatment facility that will use ion exchange technology to treat the contamination. *Id.*

In light of these allegations, the Court finds unavailing, and somewhat perplexing, Denver's contention that the Complaint includes "no allegations that the District incurred any costs to actually remove or cleanup PFAS contamination within the environment . . . through . . . methods consistent with the NCP." *Id.* at 11. Indeed, in its reply brief, Denver seems to abandon this argument for dismissal. *See* ECF No. 19 at 2 (arguing that the District's CERCLA claims must be dismissed for "two" reasons and failing to

10

challenge whether the District adequately pleaded "necessary response costs").

Accordingly, the Court finds that, at least for the purposes of a Rule 12(b)(6) motion,

The District has adequately pled the fourth element required to bring a CERCLA cost-recovery action.

### ii. The District adequately pleads release or threatened release of "hazardous substance."

The EPA designated PFOS and PFOA as CERCLA hazardous substances in May 2024. The final rule became effective on July 8, 2024. *See* 89 Fed. Reg. 39,124 (May 8, 2024). The parties do not contest this fact. *See* ECF No. 19 at 4; ECF No. 15 at 10 n.3. Rather, Denver argues that "most of the costs for which the District seeks compensation were incurred starting in 2018. The incurrence of those costs was not caused by the release of a hazardous substance because PFAS was not listed as a 'hazardous substance' at the time." ECF No. 13 at 11. Denver thus argues that the District should not be allowed to recover under CERCLA any costs that it incurred prior to 2024.

The District argues that the Court need not reach this issue at the motion to dismiss stage because it has pleaded response costs incurred after July 2024, which are still ongoing.[3] The Court agrees. A motion to dismiss "is not a proper method of challenging a particular remedy." *Duran v. Wellpath, LLC*, No. 23-cv-02853-CNS-NRN, 2024 WL 2939167, at *13 (D. Colo. June 11, 2024). "It is well settled that the prayer for relief is no part of the cause of action." *Daniels v. Thomas*, 225 F.2d 795, 797 (10th Cir.

---

[3] *See* ECF No. 1 ¶ 57 ("Because the extent and magnitude of the contamination caused by releases of PFOA and PFOS from the Fire Training Facility are not yet fully known, and because the releases and impacts are ongoing, the District will incur further necessary response costs, including but not limited to additional investigatory and cleanup costs.").

1955). "[T]he test of a complaint pursuant to a motion to dismiss lies in the claim, not in the demand. Thus, the only issue on a motion [to] dismiss is whether the claim as stated would give the plaintiff a right to any relief, rather than to the particular relief demanded." *Cassidy v. Millers Cas. Ins. Co. of Tex.*, 1 F. Supp. 2d 1200, 1214 (D. Colo. 1998).

The Court finds that the Complaint plausibly states a claim under CERCLA § 107(a) and § 113(g). Denver does not dispute in its Motion that it operates the Fire Training Facility or that it constitutes a "facility" for the purposes of CERCLA liability. Further, the Motion does not dispute that the release of PFAS, which have been designated as hazardous substances, occurred. The Motion only challenges the fourth element: that the release or threatened release of PFAS caused the District to incur necessary response costs consistent with the NCP. As previously discussed, the District has adequately pleaded in detail the ways in which it responded to the water contamination and the associated costs it incurred. Additionally, the Court finds persuasive the District's argument that the measures it took are "exactly the types of activities that CERCLA, the NCP, and the caselaw endorse as appropriate in these circumstances." ECF No. 15 at 9–10.

The Court need not decide at this time whether CERCLA liability is retroactive—i.e., whether the facts and law would justify recovery of remediation costs incurred *before* the designation of PFOS and PFOA as CERCLA hazardous substances in 2024. The question of whether the District may recover response costs incurred prior to the EPA's designation is more appropriately raised on summary judgment, at the pretrial motion stage, or at trial.

### iii. CERCLA § 114(b)'s prohibition against double recovery does not bar the District's claims on motion to dismiss.

Denver's third argument for dismissal is likewise unavailing. Denver argues that, as a "threshold matter," the District cannot use CERCLA to recover the same costs twice. *Id.* at 9. Under CERCLA § 114(b), "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same . . . costs." *Id.* Denver argues that the District unlawfully seeks double recovery because the District has already been awarded "over $64 million dollars in federal and state grants" to address the PFAS contamination, and has also settled with "several manufacturers of AFFF products in the MDL for the same damages and response costs for which it now seeks recovery from Denver." ECF No. 13 at 10.

The Court finds that, at least for the purposes of a motion to dismiss, CERCLA § 114(b) does not bar the District's cost recovery action. The Court finds persuasive the Ninth Circuit's opinion in *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458 (9th Cir. 2024). In *Santa Clarita Valley Water Agency*, the water agency brought several state-law tort and CERCLA claims arising from the Whittaker Corporation's ("Whittaker") contamination of its water supply. *Id.* at 469. After an 11-day trial, the jury awarded the water agency around $75.3 million total on the state-law claims. This amount was reduced by 10% due to the water agency's own failure to mitigate, and then offset by $2.9 million that the agency had received from a third-party in a prior settlement—bringing the total award down to $64.8 million. *Id.* Following the jury award, the district court declined to enter CERCLA § 107(a) liability against Whittaker for the agency's response costs, reasoning that it was duplicative of the jury award and

therefore precluded by CERCLA's bar on double recovery, § 114(b). *Id.* The Ninth Circuit reversed. It reasoned that while § 114(b) "precludes a party from *receiving compensation* for the same costs," *id.* at 477, it does not preclude a finding of liability under § 107(a): "A finding of liability under CERCLA for past response costs ensures that a party can recover those costs if the damage award otherwise remains unsatisfied, and it provides the party access to other remedies under CERCLA that it may be entitled to in the future." *Id.* (referencing CERCLA § 113(g)(2) (mandatory declaratory judgment on liability that is binding on any subsequent action to recover further response costs)).

The Ninth Circuit thus held that "[§ 114(b)] does not bar a finding of liability as long as the district court fashions the relief such that the plaintiff will not recover double compensation." *Id. Santa Clarita Valley Water Agency* illustrates that § 114(b) does not warrant dismissal of a CERCLA claim at the pleading stage, but rather requires the Court to consider past reimbursements at the damages or remedy stage. *See, e.g.*, *Price v. U.S. Navy*, 818 F. Supp. 1326, 1332–33 (S.D. Cal. 1992) (apportioning CERCLA liability across the responsible defendants but finding that § 114(b) barred the plaintiffs from receiving further compensation), *aff'd*, 39 F.3d 1011 (9th Cir. 1994); *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992) ("A declaratory judgment under CERCLA § 113(g)(2) "determines *liability* for future response costs, not *recoverability* of those costs.").

The Complaint alleges that there is a "huge deficit" between the funding the District has received and its necessary response costs. ECF No. 1 ¶ 2. The District also seeks declaratory relief with respect to its anticipated future response costs. *Id.* at 14.

14

Deciding at the pleading stage whether the District seeks an improper double recovery would require the Court to engage in premature speculation.

In its Motion, Denver does not point to any case where a plaintiff was barred at the pleading stage from bringing a CERCLA action due to § 114(b)'s bar against double recovery. Denver references *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 237 (D.C. Cir. 2016), as "collecting cases rejecting claims pursuant to CERCLA § 114(b) to prevent plaintiffs from receiving a windfall from their environmental cleanups." ECF No. 13 at 10 (internal quotation marks and alteration omitted). However, the collection of cases cited to in *Lockheed Martin* did not involve considerations of double recovery at the pleading stage. *See, e.g.*, *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203 (10th Cir. 2009) (reviewing district court's decision at summary judgment stage to offset damages by risk of double recovery); *Litgo New Jersey Inc. v. Comm'r of the N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013) (same); *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (same); *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1122–23 (D. Nev. 2008) (same); *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 852 F. Supp. 2d 229, 255–256 (D. Conn. 2012) (considering issue of double recovery at remedy stage).

Accordingly, the Court finds that neither of the District's claims are barred by CERCLA's prohibition against double recovery. *See Cont'l Paper Grading Co. v. Nat'l R.R. Passenger Corp. - Amtrak*, No. 21-cv-224, 2021 WL 5299772, at *2 (N.D. Ill. Nov. 15, 2021) ("Since plaintiff's CERCLA § 107(a) claim survives defendant's motion to dismiss, plaintiff's CERCLA declaratory judgment claim also survives.").

### III.    Request for Stay or Administrative Closure

In its Motion, Denver argues that, in the alternative, "a stay or administrative closure of this case is warranted pending the resolution of two independent proceedings that bear upon and could moot [the District]'s claims." ECF No. 13 at 4. First, in *U.S. Chamber of Commerce*, the U.S. Court of Appeals for the D.C. Circuit is considering whether EPA's designation of PFOA and PFOS as hazardous substances was unlawful and should be vacated. Per Denver, if the EPA's designation of PFOA and PFOS as hazardous substances is vacated, the District's claims will be moot. Second, Denver argues that this case should be stayed pending the resolution of the MDL, which is overseeing the allocation of settlement funds to class members. Denver argues that "the final allocation amount to the District in the MDL must be adjudicated before this Court can determine whether the District has a viable cost recovery claim without violating CERCLA's prohibition against double recovery." *Id.*

As this opinion has previously discussed, the mere threat of double recovery does not bar the District from pursuing its claims for cost-recovery and declaratory judgment under CERCLA, especially in light of its assertions that response costs are ongoing. The issue of double recovery may be addressed at the damages or remedy stage.[4] The Court will therefore focus its analysis on the implications of *U.S. Chamber of Commerce* and whether they warrant a stay.

---

[4] *See, e.g.*, *Levy v. Versar, Inc.*, 882 F. Supp. 736 (N.D. Ill. 1995) (finding that where plaintiffs had entered into a settlement agreement with a non-party in a prior litigation, it "would not necessarily bar the [p]laintiffs from seeking future response damages" from defendant in the instant CERCLA action).

The Federal Rules of Civil Procedure do not expressly provide for a stay of proceedings. *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-LTB-PA, 2006 WL 894955, at *2 (D. Colo. March 30, 2006) (unpublished). Federal Rule of Civil Procedure 26 does, however, provide that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). Moreover, "[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 248, 254–55 (1936) (citing *Kan. City S. Ry. Co. v. United States*, 282 U.S. 760, 763 (1931)). An order staying discovery is thus an appropriate exercise of this Court's discretion. *Id.; see also Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990).

A stay of all discovery is generally disfavored. *Bustos v. United States*, 257 F.R.D. 617, 623 (D. Colo. 2009). However, a stay may be appropriate if "resolution of a preliminary motion may dispose of the entire action." *Nankivil v. Lockheed Martin Corp.*, 216 F.R.D. 689, 692 (M.D. Fla. 2003); *see Vivid Techs., Inc. v. Am. Science & Engineering, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999) ("When a particular issue may be dispositive, the court may stay discovery concerning other issues until the critical issue is resolved.").

When considering a stay of discovery, this Court has considered the following factors: (1) the plaintiff's interests in proceeding expeditiously with the civil action and the potential prejudice to plaintiff of a delay; (2) the burden on the defendants; (3) the convenience to the Court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. *See String Cheese Incident*, 2006 WL 894955, at *2.

A court may also order a case to be administratively closed under D.C.COLO.LCivR 41.2, subject to the same standard. *See Atkins v. HCA-HealthONE, LLC*, No. 15-CV-00037-WYD-KLM, 2015 WL 1298507, at *2 (D. Colo. Mar. 19, 2015) (noting "administrative closure is the practical equivalent of a stay," and applying *String Cheese* factors to a request for administrative closure); *see also Michels v. U.S. Dep't of Just.*, No. 21-cv-01737-WJM-NRN, 2021 WL 8153753, at *4 (D. Colo. Nov. 30, 2021) ("The Tenth Circuit has construed an administrative closure to be 'the practical equivalent of a stay'") (citing *Quinn v. CGR*, 828 F.2d 1463, 1465 n.2 (10th Cir. 1987)), *report and recommendation adopted*, 2021 WL 8153755 (D. Colo. Dec. 16, 2021).

In arguing against a stay, the District states that some of the events associated with the PFAS contamination occurred around eight years ago. ECF No. 15 at 14 (citing ECF No. 1 ¶¶ 19–22, 33–35 (alleging response costs incurred starting in 2018)). It argues that "[k]ey witnesses have already retired, and others will retire in the near term, including the District's special project manager and an outside consultant instrumental to the District's water infrastructure engineering." *Id.* The District has provided no specific details regarding the nature or importance of the testimony or why the witnesses' memories are particularly vulnerable. However, the Court acknowledges

that, in general, a stay runs the risk of witnesses becoming unavailable or memories fading with the passage of time—this is a risk that is prevalent in most cases.

More importantly, as the District correctly points out, a stay of this action would not result in a mere delay in the recovery of monetary damages. The District is charged with providing safe and reliable water services to the community it serves. It has a significant interest (which overlaps with the public interest) in securing the funding and resources it needs to ensure that the water it supplies is safe from contamination. In its response, the District further emphasizes that "[t]he community at the heart of the District's service area in Commerce City consists predominantly of people of color, including many low-income households . . . . The increased water rates and cutbacks on infrastructure repair and replacement fall disproportionately on these members of the public." *Id.* at 15. Therefore, the District's interest in proceeding expeditiously weighs against granting a stay.

On the other hand, Denver argues,

> Litigating this case would impose a heavy burden on all parties, including Denver, and this factor weighs decisively in favor of a stay. This litigation will be costly for Denver, the District, the Court, and—as both parties are funded by the taxpayer—the public. CERCLA Section 107 cost recovery actions are notoriously expensive and time-consuming, typically requiring extensive expert testimony on both contested factual matters and broader questions of scientific fact.

ECF No. 13 at 14. Denver's interest in avoiding potentially unnecessary litigation costs in the event that the EPA's designation of PFOA and PFOS as hazardous substances is vacated by the D.C. Circuit Court of Appeals is certainly an important consideration that weighs in favor of granting a stay. Denver, as well as the public, has an interest in conserving taxpayer funds. *See Martinez v. Harroun*, No. 23-cv-01241-CNS-SBP, 2024

19

WL 69151, at *4 (D. Colo. Jan. 5, 2024) (noting there is "a public interest in the [City of Aurora, Colorado] not wasting taxpayer funds in unnecessary litigation costs").

Denver also accurately notes that this matter will involve complex, lengthy, and scientific discovery. *See Atl. Richfield Co. v. NL Indus., Inc.*, No. 20-cv-00234-PAB-KLM, 2021 WL 321263, at *3 (D. Colo. Feb. 1, 2021) (acknowledging that a "multimillion dollar CERCLA litigation is an inherently complicated endeavor which can oftentimes require extensive discovery and motions practice."); *Premcor Ref. Grp., Inc. v. Apex Oil Co., Inc.*, No. 17-cv-738-NJR, 2022 WL 3714700, at *5 (S.D. Ill. Aug. 29, 2022) ("Unfortunately, this is a common plight in cases arising under CERCLA, which are routinely complex involving many decades of documents and lengthy discovery."). Thus, the potential burden on Denver in proceeding with the lawsuit, in light of the parallel proceeding in the D.C. Circuit, weighs in favor of granting a stay.

Turning next to the convenience to the Court, Denver argues,

Courts in this District have repeatedly recognized that "granting [a] stay" in deference to a pending multi-district litigation "will promote judicial economy and efficiency." *Pritchett v. I Flow Corp.*, No. 09-cv-02433-WDM-KLM, 2010 WL 625024, at *1 (D. Colo. Feb. 22, 2010) ("[T]he Court agrees that awaiting a ruling from the MDL panel will conserve judicial resources and avoid the issuance of rulings on discovery and substantive motions inconsistent with those issued by other federal courts."); *see also, e.g., Deutsche Bank Tr. Co. Americas v. Fushimi*, No. 11-cv-02472-REB-KMT, 2011 WL 5864987, at *3 (D. Colo. Nov. 22, 2011) ("Indeed, avoiding the risk of inconsistent judgments and the interests of judicial economy will ordinarily outweigh any slight delay caused by a stay pending an MDL panel's ruling.")

ECF No. 13 at 15. However, as Denver itself notes in its Motion, *see id.* at 14 n.10, the cases cited above concerned proposed transfers to the MDL. *See, e.g., Pritchett*, 2010 WL 625024, at *1 (granting stay pending ruling by MDL panel on

motion to transfer); *Deutsche Bank Tr. Co. Americas*, 2011 WL 5864987, at \*3 (same). Such circumstances are not present here.

Denver also cites to *sPower Development Co., LLC v. Colorado Public Utilities Commission*, No. 17-cv-00683-CMA-NYW, 2018 WL 5996962, at \*5 (D. Colo. Nov. 15, 2018), for the proposition that a stay or administrative closure is appropriate where a parallel rulemaking proceeding could resolve or significantly impact the instant case. *See* ECF No. 13 at 14. However, *sPower* is distinguishable. In that case, the plaintiff challenged a Colorado Public Utilities Commission ("PUC") regulation in court. However, both the plaintiff and the PUC were involved in an ongoing rulemaking to rescind the regulation at issue. The PUC itself had proposed to rescind the rule, and the plaintiff had already once requested the case be delayed, arguing that the rulemaking proceeding "may resolve the litigation." *sPower*, 2018 WL 5996962, at \*3. When the plaintiff later opposed a longer administrative closure, the court emphasized the plaintiff's prior request to delay the case. *See id.* at \*6–7. As the District points out, here, the EPA is defending its regulation in the parallel proceeding and the District has not previously requested a stay or caused any delay in the present matter.

Moreover, the Court finds persuasive the District's argument that even if the D.C. Circuit were to find the EPA's rule deficient in some way, it is not necessary that the rule will be *vacated*. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (affirming remand of rule without vacatur upon considerations of the seriousness of the deficiency and disruptive consequences of vacatur); *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019)

21

(remanding Clean Air Act regulation without vacatur because vacatur "would risk significant harm to the public health or the environment"). The District points out that in *U.S. Chamber of Commerce*, the EPA has requested remand without vacatur should the D.C. Circuit find the rule deficient, citing the potential for disruption to the government's ongoing efforts to address PFAS contamination. *See* ECF No. 15 at 13–14 (citing excerpts of the EPA's brief in *U.S. Chamber of Commerce* (found at ECF No. 15-2)).

Considering and weighing all these competing interests, the Court does not find that a stay would provide any real convenience to the Court. Additionally, the Court has its own well-recognized interest in disposing "of the causes on its docket with economy of time and effort for itself . . . ." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The District has a viable CERCLA claim under the law as it currently stands, and there exists a substantial public interest in moving the case towards a disposition and enforcing federal protections aimed at curbing the environmental and health risks posed by industrial pollution.

In sum, after considering the *String Cheese* factors and the unique circumstances of this particular case, Denver's request for a stay or administrative closure is **DENIED.**

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby **ORDERS** that Denver's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or, in the Alternative, to Stay, ECF No. 13, is **DENIED.**

It is further **ORDERED** that the parties shall jointly contact chambers within seven (7) days of this Order to set a Scheduling Conference.

Dated at Denver, Colorado this 3rd day of August 2026

_____
N. Reid Neureiter
United States Magistrate Judge